IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>$65,000.00 UNITED STATES CURRENCY,<br><br>Defendant. | Civil No. 8:26CV515<br><br>**COMPLAINT FOR FORFEITURE *IN REM*** |

The United States of America, for its cause of action against the Defendant property, pursuant to Rule G(2) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions, states and alleges as follows:

**Nature of the Action**

1. This is an action to forfeit property to the United States for violations of 21 U.S.C. § 881.

**The Defendant *in rem***

2. Defendant property is $65,000.00 in United States Currency seized by law enforcement from Robert Enlow and Branch Enlow during a traffic stop on November 24, 2024.

3. The United States Marshals Service currently has custody of the Defendant property.

**Jurisdiction and Venue**

4. This Court has subject matter jurisdiction for an action commenced by the United States pursuant to 28 U.S.C. § 1345, and for an action for forfeiture pursuant to 28 U.S.C. § 1355(a). This Court also has jurisdiction over this particular action pursuant to 21 U.S.C. § 881.

5. This Court has *in rem* jurisdiction over the Defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

**Basis for the Forfeiture**

7. Defendant property, $65,000.00 United States Currency, is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes 1) money, negotiable instruments, securities and other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act, 2) proceeds traceable to such an exchange, and/or 3) money, negotiable instruments and securities used and intended to be used to facilitate a violation of the Controlled Substances Act.

**Facts**

8. On November 24, 2024, Seward County Sheriff's Office Deputy Michael Mejstrik (hereinafter "Dep. Mejstrik") was on patrol operating a marked vehicle.

9. At approximately 1912 hours, Dep. Mejstrik initiated a traffic stop on a white GMC Sierra truck bearing Tennessee license plate (TN 143BMZP) near mile marker 379 on Interstate 80 westbound after observing the GMC Sierra commit several traffic infractions in violation of Nebraska law.

10. In particular, near mile marker 385 Dep. Mejstrik observed the GMC Sierra make a lane change from the outside lane to the inside lane without signaling 100 feet prior as required by Nebraska law. Dep. Mejstrik observed the GMC Sierra change lanes while activating the turn signal.

11. Additionally, Dep. Mejstrik observed the GMC Sierra subsequently drive over the solid white shoulder line twice. First, near mile marker 383 and then again near mile marker 381.

12. Following these observations, Dep. Mejstrik observed the GMC Sierra make another unsafe lane change from the outside lane to the inside lane of travel without signaling 100 feet prior. This infraction occurred near mile marker 380.

13. Dep. Mejstrik continued to watch the GMC Sierra as it followed the vehicle traveling in front of it at an unsafe distance in violation of Nebraska traffic laws.

14. In particular, Dep. Mejstrik observed this traffic infraction near mile marker 380 while the GMC Sierra was still in the inside lane of travel.

15. Dep. Mejstrik estimated the GMC Sierra was traveling at 78 miles per hour.

16. Dep. Mejstrik utilized his training and experience as well as a stopwatch application on his mobile computer to time the GMC Sierra's speed of travel.

17. Based on his observations, Dep. Mejstrik calculated the GMC Sierra to be traveling .72 seconds behind the vehicle in front of it.

18. Based on these observations, Dep. Mejstrik believed the GMC Sierra was following too close to another vehicle in violation of Nebraska law.

19. After initiating the traffic stop, Dep. Mejstrik made contact with the driver of the GMC Sierra and explained the traffic violations.

20. The driver provided Dep. Mejstrik with an Idaho driver's license which identified him as Branch Joseph Enlow (hereinafter "Branch").

21. Also inside the GMC Sierra in the front passenger seat was Robert Tonner Enlow (hereinafter "Robert").

22. Dep. Mejstrik requested Branch exit the GMC Sierra and have a seat in the front passenger seat of his patrol car while being issued a warning for the traffic infractions.

23. While Branch exited the GMC Sierra, Dep. Mejstrik spoke with Robert.

24. Robert advised he was the registered owner of the GMC Sierra.

25. Robert further advised he was headed to Idaho to drop his son off and see his grandkids for 1-2 days.

26. Robert also advised that Branch came down to visit him in Tennessee where he stayed for about 2-3 weeks.

27. Dep. Mejstrik returned to his patrol car and provided Seward dispatch with Branch's information and requested they check his license status, warrants, and criminal history.

28. While Dep. Mejstrik prepared the written warning, he conversed with Branch.

29. Branch advised he was on his way home from Idaho.

30. Branch advised his dad was Robert.

31. Branch further advised he flew to Tennessee about a month prior to help Robert sell puppies.

32. Branch stated Robert was taking him back home and was going to visit his grandkids which he only gets to see once a year.

33. Branch stated Robert was then going to travel up to Washington where he was going to visit more family.

34. Branch advised Robert was retired.

35. During the course of the traffic stop, Dep. Mejstrik became suspicious criminal activity was afoot based on his training and experience.

36. In particular, the Carfax for the GMC Sierra revealed the GMC Sierra had accrued over 125,000 miles in the previous 11 months.

37. Based on Dep. Mejstrik's training and experience, he knew that the GMC Sierra would have to be driven approximately 200 hours per month at approximately 70 miles an hour to accrue that much mileage.

38. Additionally, based on his training and experience, Dep. Mejstrik was aware that the innocent motoring public averages approximately 13,000 miles per year.

39. Based on his training and experience, Dep. Mejstrik found it highly suspicious that a retired person would accumulate miles on their vehicle which were over 10 times the national average.

40. Further, Dep. Mejstrik observed the GMC Sierra had a vehicle service completed in a source area known for bulk marijuana sales, based on Dep. Mejstrik's training and experience.

41. Dep. Mejstrik reviewed License Plate Reader data which showed the GMC Sierra make multiple cross-country trips to Redding, California.

42. Based on his training and experience, Dep. Mejstrik knows Redding, California to be a source area of bulk marijuana sales.

43. The GMC Sierra had a topper on the bed of the truck.

44. Based on his training and experience, Dep. Mejstrik knows that the combination of a pickup truck with a topper is a favored means of transporting bulk marijuana by drug traffickers.

45. Dep. Mejstrik also observed the GMC Sierra's topper appeared to have blackout tint on all 3 windows.

46. Based on his training and experience, Dep. Mejstrik found this to be suspicious as a high level of window tint can be indicative that a person is trying to hide items.

47. Throughout the traffic stop, Dep. Mejstrik observed Branch was extremely nervous.

48. In particular, Dep. Mejstrik observed Branch's hands to shake throughout the duration of the stop.

49. Dep. Mejstrik also noticed Branch's breathing to be labored.

50. During the traffic stop, Seward County dispatch advised Dep. Mejstrik that Branch had previous criminal history that involved narcotics.

51. In particular, Branch had previous marijuana distribution charges.

52. Additionally, Dep. Mejstrik became aware that Robert had previous felony drug charges.

53. When asked about his criminal history, Branch attempted to downplay the severity of his criminal history by admitting to a small possession charge when he was younger.

54. After Dep. Mejstrik issued Branch a written warning for the stop, he informed Branch that the traffic stop was complete.

55. Dep. Mejstrik then engaged Branch in a consensual conversation.

56. Dep. Mejstrik asked Branch if there was any marijuana, heroin, cocaine, methamphetamine or fentanyl in the vehicle.

57. Branch advised Dep. Mejstrik that there was not.

58. Dep. Mejstrik asked Branch if there were any large amounts of United States currency in the GMC Sierra. In particular, an amount greater than ten thousand dollars.

59. Branch informed Dep. Mejstrik there was not.

60. Dep. Mejstrik requested consent to search the GMC Sierra.

61. Branch informed Dep. Mejstrik the truck belonged to Robert and that the decision to allow law enforcement to search the truck would be up to Robert.

62. Dep. Mejstrik approached the GMC Sierra and made contact with Robert.

63. Dep. Mejstrik asked Robert the same questions he asked Branch regarding whether there were drugs and/or bulk currency over ten thousand dollars in the vehicle.

64. Robert advised Dep. Mejstrik there was no marijuana, heroin, cocaine, methamphetamine, fentanyl or any amount of currency over ten thousand dollars in the vehicle.

65. Robert denied consent to search the GMC Sierra.

66. Dep. Mejstrik advised Robert he would deploy his dog around the exterior of the GMC Sierra.

67. Dep. Mejstrik retrieved his certified narcotics detecting dog and deployed her near the rear of the GMC Sierra.

68. Dep. Mejstrik immediately observed his certified narcotics detecting dog alert and indicate to the presence of narcotic odor at the tailgate of the truck.

69. Dep. Mejstrik returned to his patrol car and informed Branch that the certified narcotics detecting dog indicated on the GMC Sierra.

70. At that time, Branch reached into his pocket and produced a THC vape pen.

71. Dep. Mejstrik also informed Robert that the certified narcotics detecting dog indicated on the GMC Sierra.

72. Dep. Mejstrik further advised Robert he had probable cause to search the GMC Sierra.

73. Dep. Mejstrik asked Robert if he carried a firearm.

74. Robert stated he did while attempting to open the center console.

75. Dep. Mejstrik instructed Robert to leave it where it was.

76. Later, Dep. Mejstrik recovered a loaded Sig Sauer P238 handgun which contained 1 round in the chamber and another 6 rounds of ammunition in the magazine.

77. Robert exited the GMC Sierra and informed Dep. Mejstrik he had more money inside of the GMC Sierra and that he was planning to buy a truck with it.

78. Robert further stated the deputies would "probably seize it", referring to the cash.

79. Robert stated there was about $40,000 in the truck that he forgot about when Dep. Mejstrik asked him about bulk currency earlier.

80. Dep. Mejstrik searched the GMC Sierra with Deputy Tyson Osborn.

81. During the search, the deputies located 9 heat-sealed/plastic wrapped packages of marijuana which had a total weight of approximately 30 lbs.

82. Based on his training and experience, Dep. Mejstrik knows this quantity of marijuana and the way it was packaged is indicative of drug trafficking, not personal use quantity.

83. The deputies also located 117 THC vape cartridges.

84. Based on his training and experience, Dep. Mejstrik knows this quantity of THC vape cartridges is indicative of drug trafficking, not personal use quantity.

85. Deputies located a backpack behind the driver's seat that contained Robert's passport, 2 drug ledgers, a large amount of United States currency, and another Sig Sauer handgun.

86. This second Sig Sauer firearm was chambered in 9mm and loaded with 8 rounds of ammunition in the magazine.

87. In total, the deputies seized $65,000 in United States currency.

88. The currency was packaged in a grocery style bag and partially heat-sealed.

89. The currency was mostly rubber-banded with a few bank bands present as well.

90. The currency consisted of 2,150 $20 bills, 98 $50 bills, and 171 $100 bills.

91. Deputies placed Branch and Robert in handcuffs.

92. Before departing, Branch stated "everything is mine man."

93. During the traffic stop, the deputies also seized cellular phones from Robert and Branch.

94. Law enforcement searched the phones pursuant to a search warrant.

95. On Robert's phone, he had approximately 1,370 images related to drugs.

96. In particular, marijuana and marijuana related products as well as psilocybin mushrooms.

97. The images included *inter alia* marijuana buds from various strains as well as pictures of large marijuana grows and bulk marijuana.

98. Also on Robert's phone, there were numerous chats between Robert and Joseph Enlow regarding drug trafficking.

99. Robert's phone also included photographs of bulk currency.

100. Law enforcement also located several videos on Robert's phone whereby Robert is at marijuana grows.

**Claim for Relief**

WHEREFORE the United States of America prays the Defendant property be proceeded against for forfeiture in accordance with the laws, regulations and rules of this Court; that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that the Defendant property be condemned, as forfeited, to the United States of America and disposed of according to law and regulations; that the costs of this action be assessed against the Defendant property; and for such other and further relief as this Court may deem just and equitable.

UNITED STATES OF AMERICA,
Plaintiff

LESLEY A. WOODS
United States Attorney

By: s/ Mikala Purdy-Steenholdt
MIKALA PURDY-STEENHOLDT
(NY#5112289)
Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE 68102-1506
Tel: (402) 661-3700
Fax: (402) 345-5724
E-mail: Mikala.Purdy-Steenholdt@usdoj.gov